## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

DOROTHY MAES,

    Plaintiff,

v.

LEPRINO FOOD COMPANY, a Colorado corporation,

    Defendant.

_____

## COMPLAINT AND JURY DEMAND
_____

Plaintiff, Dorothy Maes, by and through her undersigned attorney, for her Complaint against the Defendant, Leprino Food Company, alleges as follows:

### NATURE OF THE ACTION

1. This is an action for national origin or ethnicity discrimination, hostile work environment, disparate impact discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.§ 2000e, *et seq.,* as amended, and the corresponding provisions of the Colorado Anti-Discrimination Act ("CADA") C.R.S. §24-34-401, *et seq.* Plaintiff seeks compensatory and punitive damages, reinstatement, front pay and back pay, restored benefits, expert witness fees, attorney fees, court costs, and other relief.

### JURISDICTION AND VENUE

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1331 (Federal Question Jurisdiction), §1334 (Civil Rights Original Jurisdiction, and *§1367* (Supplemental

1

Jurisdiction). Plaintiff's claims are based on federal law under Title VII of the Civil Rights Act of 1964, as amended, and state law, pursuant to the Colorado Civil Rights Act, C.R.S. § 24-34-401, *et seq*.

3. Plaintiff has complied with all conditions precedent to the filing of this action. A copy of the Right to Sue letter issued by the Equal Employment Opportunity Commission is attached hereto and incorporated herein by this reference, (Ex.1).

## PARTIES

4. Plaintiff, Dorothy Maes, resides in the City of Greeley, County of Weld, Colorado.

5. Defendant, Leprino Food Company is a Colorado corporation in good standing, whose principal office is located at 1830 West 38th Avenue, Denver, Colorado 80211 and whose cheese processing plant in question is located at 1302 1st Street, Greeley, CO 80631.

## GENERAL ALLEGATIONS

6. Plaintiff was hired by Defendant Leprino Foods Company on August 26, 2013.

7. When Plaintiff received the job offer from Leprino Foods Company, she moved her residence from Longmont, Colorado to Greeley, Colorado.

8. Plaintiff commenced working for Defendant on September 1, 2013.

9. On September 1, 2013, Plaintiff's first day at work, the supervisor, Tara Kolbuchar (Caucasian), was not aware that Plaintiff was supposed to begin working there, so she had Sylvia Jaramillo put her in the training center where Plaintiff was required to do the "e-learnings test" without any instruction or training, making it impossible for her to perform adequately on the test.

10. From September 1 to September 15, 2013, Sylvia Jaramillo and Nora Jaramillo, two

       Hispanic women and sisters working on the B-team, began Plaintiff's training on the night shift, teaching her where to obtain samples, how to run the equipment (FT2, CEM, PH, Refrac), how to calculate ratios and percent and how to enter the numbers on MES. They were very kind, helpful, taught her all of the basics, and complemented her regarding the speed with which she was learning the procedures. However, there were still technical processes and computer work for which Plaintiff needed training.

11. On September 15, 2013, the Plaintiff was assigned to the C-Team with Amy Weaver (Caucasian), Felicia Deines the team lead (Caucasian), and supervisor Tara Klobuchar (Caucasian).

12. On September 15, 2013, Amy Weaver, who had worked for Defendant for approximately six months, was assigned to train Plaintiff on the technical process; however, she refused, stating that "they are not paying me enough to train her." Amy Weaver told their co-worker, Felicia (Caucasian), "it's all about the percent, that a certain percent of every race, sex, religion . . . had to be met, but it didn't mean [she] had to train them."

13. Amy Weaver disliked people/employees who were "different," including Hispanics, African Americans, disabled, and other protected class employees, all of whom she considered "f—ing stupid."

14. Amy Weaver regarded Plaintiff as "Mexican" even though Plaintiff was of Spanish American ancestry. She subjected Plaintiff and other protected class employees to ongoing severe abuse, harassment, vulgar verbal language, ethnic slurs ("big, fat, slow, lazy") and personal and derogatory humiliating comments about the Plaintiff and others similarly situated in front of co-workers.

15. Even though Amy Weaver had been assigned to train Plaintiff, she refused to talk to her or to allow Plaintiff to do Plaintiff's work. Plaintiff was told by her supervisor "to ask questions and take notes," regarding the technical processes. However, when Plaintiff would ask Amy Weaver a question, she usually responded by saying, "DON'T F—ING ASK ME, F—ING FIGURE IT OUT YOURSELF," or words to that effect. Plaintiff was afraid of Amy Weaver's aggressiveness and felt threatened.

16. Amy Weaver made false complaints about the Plaintiff to the team lead, Felicia, and the supervisor, Tara Kolbuchar, alleging that Plaintiff was "just standing around," that the Plaintiff was late, or that she wanted them to keep Plaintiff away from the control room and Weaver.

17. Plaintiff asked repeatedly to be trained on the computer entry of the samples that she was taking. One day Felicia and Amy were waiting for Plaintiff by the computer when Felicia stated, "So you want to learn the computer side?" When the training began, Felicia was on one side of Plaintiff and Amy on the other, both of them harshly ordering her to go here and there in a very fast pace, yelling and cussing at her and claiming that everything she did was wrong or "f----ed up". Plaintiff was overwhelmed, stressed and frantic, and desperately in need of proper training, instruction, and supervision. Plaintiff went home shaken, verbally abused, and crying.

18. Even though the supervisor, Tara Kolbuchar, knew that the Plaintiff was being harassed, abused, and discriminated against, she did nothing. She condoned the behavior, and often engaged in concomitant abusive behavior.

19. At all times relevant, the Plaintiff performed her job satisfactorily. Plaintiff made a point

of keeping up with her samples and doing jobs that others did not like to do, so that she could avoid confrontations with Amy Weaver and Felicia Deines.

20. When Amy Weaver was out of the control room, Plaintiff would try to practice making her sample entries on the computer, but when Amy Weaver returned she would often shove Plaintiff away from the computer and grab the mouse.

21. Amy Weaver told other employees that she would chase Plaintiff out of the control room, and then follow Plaintiff to yell and cuss at Plaintiff, because it would be Amy Weaver's word against that of the Plaintiff.

22. On another occasion, both Amy Weaver and Felicia Deines complained to Plaintiff that she was too slow taking the samples. When Plaintiff responded that she was just taking the samples the way that her trainer, Sylvia, had taught her to do, Felicia replied, "well, the person who trained you (Sylvia, Hispanic) and her f—en sister (Nora, Hispanic) don't know what the f–k they are doing." Plaintiff was shaken and upset by this verbal assault on her trainer, and again went home in tears.

23. After this incident, Plaintiff on her day off went to the company Human Resources person, Lisa Prater, who called Celeste, the head supervisor, to join them. Plaintiff told them about the harassment, abuse, discrimination, bullying, cursing and verbal attacks, and about the lack of training. Celeste said that she would talk to them.

24. When Plaintiff's supervisor, Tara Kolbuchar, found out that Plaintiff had contacted Human Resources about her concerns, Tara called Plaintiff, Felicia Deines, and Amy Weaver into her office. Tara Kolbuchar told Plaintiff in front of Felicia and Amy that she did not appreciate that Plaintiff had gone to Human Resources, and to never do so again,

stating further that she hated when people went behind her back. Amy Weaver falsely accused the Plaintiff of "throwing her under the bus." Rather than trying to resolve her complaints, Tara made Plaintiff feel threatened, isolated, and helpless.

25. When Plaintiff complained to Tara about her treatment, Tara told Plaintiff that she was being "overly sensitive," and made no effort to resolve any of these employment issues.

26. Thereafter, the abuse and animus toward Plaintiff intensified in a retaliatory manner. Amy Weaver again grabbed the computer mouse away from Plaintiff. This time, however, she threw it at Plaintiff, hitting Plaintiff in the chest in front of another co worker. Plaintiff therefore felt further threatened and retaliated against by Amy Weaver's abusive behavior.

27. Amy Weaver's ongoing refusal to allow the Plaintiff to do any of the computer work that Plaintiff was assigned to do was exemplified by her acts in pushing Plaintiff away from the computer.

28. Plaintiff was aware that many other employees were experiencing the same or similar hostile, abusive, retaliatory, and discriminatory treatment, but that they were afraid to complain for fear of losing their jobs.

29. One such employee named, John, who started working at the same time as Plaintiff, was assigned to Amy Weaver to train him by another supervisor, Dominic. John was a power lifter and thus a big man. Amy Weaver told Dominic, "I am not going to train that fat f–k, let him learn on his own and if he keeps f–king things up, you should fire his fat ass."

30. Kevin Peterson, a sanitation department employee, spoke differently than others, so Amy

Weaver told Felicia Deines and Dominic that they should just fire him because he was "creepy."

31. Plaintiff made numerous requests to be assigned to a different shift. Even though there were vacancies on a couple of shifts, her requests were repeatedly denied unlawfully by Tara Kolbuchar.

32. The daily constant verbal attacks and vulgar discriminatory conduct and invidiously hostile and retaliatory environment was intolerable, so Plaintiff went to the Human Resources person a second time on October 4, 2013, but again nothing was done. On October 9, 2013, Plaintiff's supervisor, Tara Kolbuchar, called Plaintiff into her office, telling her that she was "pissed off" by her complaint to Human Resources, and told her never to do it again. Plaintiff felt very threatened and retaliated against thereby.

33. The members of the C-Team, including Tara Kolbuchar, thus retaliated against the Plaintiff when Plaintiff tried to protect herself in the manner recommended by Defendant's own "Standards of Ethical and Business Conduct."

34. Plaintiff requested training by Sylvia and Nora Jaramillo, but Celeste and Tara stated that Sylvia and Nora (Hispanics) did not know what they were doing.

35. Finally, Tara Kolbuchar and Celeste agreed to allow Plaintiff to be trained on the A-Team for one month from October 20 to November 30, whereupon Plaintiff would have to return to C-Team and "make it work."

36. The supervisor for the A-Team, Arturo, put together a training program for Plaintiff and found a time slot when they were not too busy to complete the testing. In fact, Arturo gave her permission to come in on her day off to get the entire test done. Plaintiff

completed the tests and passed all of her "e-learnings" with certificates documenting her success.

37. A-Team members Armando and Daniel prepared Plaintiff to run the entire floor and provided the computer training that Amy Weaver and the other members of the C-Team had refused to give to her. Plaintiff was provided with all of the training for the "membrane area," including showing her how to perform JTPRs and other such functions which the C-Team refused to provide training with regard thereto. Plaintiff worked well with the A-Team and all other groups that she dealt with during her training. Plaintiff was complemented for her work performance and was told that she was qualified for her position.

38. During this training period, Tara told Plaintiff to check in with her every week to see when Plaintiff had to return to her team, the C-Team. Every week Plaintiff asked to be moved to another team, rather than the C-Team, because she knew that the issues of harassment, abuse, retaliation and discrimination had never been addressed. However, Tara always refused her request for any transfer.

39. On November 30, 2013, when Plaintiff returned to the C-Team, she was immediately treated with hostility. Nevertheless, Plaintiff performed her work, and at one point Plaintiff was in the middle of "pass downs" on samples with another supervisor, Darlene (African American), when Amy Weaver rudely told Darlene "YOU can go now. YOU CAN GO NOW! JUST LEAVE!" It had apparently made Amy Weaver very angry to see Darlene helping Plaintiff. After Darlene was done giving Plaintiff the "pass down," she left. Darlene was upset by the altercation and notified corporate management of

Weaver's ill treatment.

40. After Darlene left, Amy Weaver refused to allow Plaintiff to work either with the samples or on the computer, although Felicia had told Amy Weaver that this work had to be shared. However, when Felicia left, Amy refused to allow Plaintiff to work.

41. It was Plaintiff's first day back on the C-Team and the work environment was so hostile, abusive, and retaliatory that it made Plaintiff physically ill, frightened, and anxious. Plaintiff could no longer endure such unlawful workplace treatment, and was forced to leave her employment. Plaintiff was thus constructively discharged on November 30, 2013.

42. Due to Plaintiff's Hispanic ethnicity or heritage, the C-Team members and supervisory personnel engaged in national origin related discrimination, harassment, verbal abuse, retaliation, which Defendant's supervisors, agents and employees allowed and condoned, contrary to law and Defendant's own policies and procedures.

44. At all times relevant, Defendant did nothing to remediate the pervasively and overtly hostile, abusive, retaliatory, and discriminatory work environment endured by Plaintiff and other similarly situated employees.

### FIRST CLAIM FOR RELIEF
(National Origin or Ethnicity Discrimination)

45. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

46. Plaintiff experienced unremedied, overt, intentional, flagrant, offensive and invidious discrimination in the workplace.

47. Plaintiff had a good faith belief that the unlawful conduct was discriminatory, and she tried to protect herself from the ongoing national origin discrimination and the hostile work environment by complaining on numerous occasions directly to her supervisors, Tara Kolbuchar, Celeste, the head supervisor, and the Defendant's Human Resources person, Lisa Prater.  Plaintiff thereby engaged in protected opposition to such discriminatory behavior and treatment.

48. Despite such pleas from the Plaintiff for relief from such acts of national origin discrimination and of hostile work environment, the Defendant, its agents and employees did nothing to protect the Plaintiff, her rights and/or protected interests in her continued employment.

49. As a direct and proximate result of the acts and omissions of the Defendant, its agents and employees described herein, Plaintiff has suffered and incurred, or may reasonably be expected suffer or incur the following damages and other losses, including but not limited to:  compensatory and punitive damages, reinstatement, front pay and back pay, severe emotional anguish, upset, or distress; embarrassment, loss or impairment of enjoyment of life, pain and suffering, humiliation, damage to reputation, credit, and character; and such other damages as may be proven at trial, including incidental and consequential damages, plus interest, reasonable attorney fees, and court costs.

**SECOND CLAIM FOR RELIEF**
(Hostile Work Environment)

50. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

51. Plaintiff endured an overtly and pervasively hostile, abusive and invidiously

discriminatory and retaliatory work environment that was steeped in racial and national origin or ethnicity animus. Due to her Hispanic ethnicity or ancestry, Plaintiff was victimized thereby, including in the terms and conditions of her employment, which were accordingly adversely affected by such hostile and discriminatory and unlawful conduct.

52. Plaintiff complained to the Defendant's Human Resources person, Lisa Prater, her supervisor, Tara Kolbuchar, and Celeste, the head supervisor. The Defendant, its agents and employees did absolutely nothing in response, thus permitting reasonable people to infer that the severe national origin or ethnicity discrimination, the hostile work environment, retaliation, and other forms of blatant discrimination that permeated the workplace exhibited by co-workers was thereby condoned.

53. By allowing Plaintiff's co-workers and supervisors to engage in such offensive discrimination without proper supervision, discipline or investigation of said employees, Defendant created, maintained, fostered, or furthered such a hostile and abusive work environment, that so victimized Plaintiff and others similarly situated.

54. Plaintiff suffered emotionally and mentally and physically due to the ongoing unremitting abuse, harassment, discrimination, retaliation and hostility which ultimately resulted in her constructive discharge from her employment with Defendant.

54. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer such damages described herein above and such damages and harm as may be proven at trial.

### THIRD CLAIM FOR RELIEF
(Retaliation)

55. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth

herein.

56. Under the circumstances of this case, Plaintiff had a right to enter into a contract for employment with Defendant with the reasonable expectation that she would be treated fairly and lawfully in a non-discriminatory manner and to not be subjected to retaliation for complaining about such workplace discrimination, and unlawful acts or omissions.

57. Plaintiff went to her supervisors and Defendant's Human Resources Department to inform them of the verbal abuse, vulgarities, national origin or ethnicity degradation and humiliation, asking for protection from further such acts.

58. In response, Plaintiff's supervisor, Tara Kolbuchar, reprimanded her in front of her co-workers for so complaining to Human Resources. At no time during the meeting with Plaintiff's supervisor and co-workers did the supervisor discuss the incidents of hostility and discrimination, or take any action with regard to the egregious discrimination, hostile, work environment and other unlawful acts or omissions.

59. At all times relevant, Plaintiff had a reasonable expectation or property interest in the terms and conditions of her ongoing and continuing employment free of such discrimination and unlawful acts or omissions, all of which the Defendant's, its agents and employees summarily disregarded and violated.

60. Defendant, its agents and employees thus willfully, or intentionally caused Plaintiff's constructive discharge.

61. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer such damages described herein above and such damages and harm as may be proven at trial.

## FOURTH CLAIM FOR RELIEF
(Disparate Treatment)

62. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

63. The terms and conditions of the employments of Plaintiff and other similarly situated protected class employees were thus deleteriously treated in an onerous, adverse, disparate, and discriminatory manner by Defendant, and its predominately Caucasian supervisory and managerial employees.

64. Defendant provided Plaintiff with an employee manual, entitled *Standards of Ethical and Business Conduct,* which prohibits "racial, national origin, negative or harassing comments," and which provides a compliance process that places responsibility on the "Supervisors and Management for Compliance." Defendant, its management, supervisors and employees, refused to follow or abide by any of these procedures or process with regard to the Plaintiff's complaints of harassment abuse, discrimination, and retaliation choosing instead to ignore all such acts and to fail to investigate her complaints.

65. Defendant's disparate treatment of Plaintiff and other employees similarly situated is demonstrated by the Defendant's failure and refusal to comply with the protections afforded by its own policies or those afforded by federal and state law.

66. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer such damages described herein above and such damages and harm as may be proven at trial.

## FIFTH CLAIM FOR RELIEF

(Disparate Impact)

71. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

72. At all times relevant, Defendant's employment practices have had a marked disparate impact upon its protected class employees such as Plaintiff and others similarly situated in the terms and conditions of their employment.

73. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer such damages described herein above and such damages and harm as may be proven at trial.

WHEREFORE, the Plaintiff prays that the Court award Plaintiff all relief requested herein including: compensatory and punitive damages, reinstatement, front pay and back pay, damages for severe emotional anguish, upset, or distress; loss or impairment of enjoyment of life, pain and suffering, humiliation, damage to reputation, credit or creditworthiness, and character; and such other damages as may be proven at trial, including incidental and consequential damages, plus interest, an award of reasonable attorney fees and costs, as provided by 42 U.S.C. § 2000e *et seq.*, and other laws, and for such other relief as the Court deems consistent herewith.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 5, 2015                Respectfully submitted,

                                      */s/ Richard K. Blundell*
                                      Richard K. Blundell
                                      Law Office of Richard K. Blundell
                                      1223 8th Avenue
                                      Greeley, CO 80631
                                      Ph: (970) 356-8900
                                      Fax: (970) 353-9977
                                      Email: rick@rkblaw.net

<u>Plaintiff's address</u>:
Dorothy Maes
2110 16th Street
Greeley, CO 80631